IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL DOCKET NO. 3:00-CV-103-V

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| IBS INC. (A NC CORP.),<br>IMC TRADING, INC. (A NC CORP.),<br>IMC TRADING, INC. (AN ARIZ. CORP.),<br>JOE MILLER COMPANY d/b/a<br>IMC TRADING (A CAL. CORP.),<br>MAZUMA TRADING GROUP, INC.<br>d/b/a PINPOINT MARKETING, LTD.<br>(A FL. CORP.),<br>INTERNATIONAL BULLION SERVICES,<br>INC. (BAHAMAS)<br>ALAN STEIN, JOSEPH FINATERI,<br>MICHAEL TEMPLE, AND SAMUEL<br>KINGSFIELD | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| KIMBERLYNN CREEK RANCH, INC.<br>(A CAL. CORP.), KINGSFIELD RACING, INC.<br>(A NEV CORP.), F.X. & B., L.L.C. (A NEV.<br>CORP.), A.J.S. ENTERPRISES, INC.<br>(a Nevada Corporation), AND PAMELA<br>KINGSFIELD, | ) ) ) ) ) ) ) |
| Relief Defendants. | ) ) ) |

The ORDER label appears to the right, centered vertically: ORDER

THIS MATTER is before the Court upon Plaintiff Commodity Futures Trading

1



Commission's (hereinafter "CFTC") Motion for Summary Judgment against Defendants Stein, Finateri, Temple, and Samuel Kingsfield as to all claims. The Motion seeks issuance of a permanent injunction, restitution, disgorgement, and the imposition of civil monetary penalties against all Defendants. Further, as to Relief Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc., FX & B, Inc., and Pamela Kingsfield, the Motion seeks a judgment of disgorgement with respect to any amounts Relief Defendants hold which flowed from the alleged injurious conduct. Briefs in opposition have been filed by Defendants Stein, Temple, Samuel Kingsfield, Pamela Kingsfield, Kimberlynn Creek Ranch, Inc., and Kingsfield Racing, Inc. It appears that all briefs have been filed, and the matter is ripe for disposition.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986); *Celotex Corp. v. Catrett*, 477 U. S. 317, 321 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. However, the party opposing summary judgment may not rest upon mere allegations or denials, and a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249-50.

In considering motions for summary judgment, courts view the facts and inferences in the light most favorable to the party opposing the motion. *Id.* at 255; *Cole v. Cole*, 633 F.2d 1083, 1089 (4th Cir. 1980). Summary judgment, consequently, is proper where "the record taken as a

2

whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. PROCEDURAL HISTORY[1]

On March 13, 2000, Plaintiff CFTC filed a Complaint pursuant to the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (hereinafter "the Act")[2], alleging fraud in connection with the purchase or sale of commodity futures contracts and the sale of commodity futures contracts on a non-registered market. The Complaint seeks permanent injunctive relief, orders of disgorgement and restitution, and civil penalties against Defendants and Relief Defendants. Along with its Complaint, the CFTC filed an *ex parte* Motion for Statutory Restraining Order, as is provided for in section 13a-1 of the Act. The Court granted that Motion in its Order of March 13, 2000. The restraining order, among other things, froze all assets of Defendants and Relief Defendants which related to the alleged illegal activity.

On June 21, 2000, the Court issued a preliminary injunction which prohibited the Defendants from selling or offering to sell commodity futures contracts. The injunction also froze assets related to the alleged illegal activity, appointed a permanent receiver to oversee Defendants IBS, Inc. (a North Carolina corporation) (hereinafter "IBS-NC"), Mazuma Trading Group, Inc. d/b/a Pinpoint Marketing, Ltd., IMC Trading, Inc. (a North Carolina corporation) (hereinafter "IMC-NC"), IMC Trading, Inc. (an Arizona corporation) (hereinafter "IMC-AZ"),

---

[1] The Court shall only briefly rehash the procedural history contained in great detail in its Orders of June 21, 2000, and April 1, 2002.

[2] In keeping with the previous Orders in the instant case, all citations to the Act refer to the United States Code.

3

IMC Trading, Inc. (a Nevada corporation) (hereinafter "IMC-NV"), Joe Miller Company d/b/a

IMC Trading (a California corporation) (hereinafter "IMC-CA")[3], and any subsidiaries thereof,

required disclosure of substantial financial information to the receiver, and required both

Defendants and Relief Defendants to provide an accounting of any and all funds acquired by way

of the alleged illegal activity. Relief Defendants appealed the issuance of the preliminary

injunction on the grounds that the Court lacked subject matter jurisdiction, and the Fourth Circuit

affirmed the entry of the injunction. *Commodity Futures Trading Comm'n v. Kimberlynn Creek

Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2002).

By way of amended complaint filed on October 20, 2000, Plaintiff CFTC added

Defendants Samuel Kingsfield and International Bullion Services, Inc. (hereinafter "IBS-

Bahamas") as principal defendants and subsequently sought to have the Court's preliminary

injunction of June 21, 2000 amended to apply its prohibitions and requirements to said

Defendants. On April 1, 2002, the Court granted the CFTC's motion, thus adding Defendants

Samuel Kingsfield and IBS-Bahamas to the list of Defendants as to whom the preliminary

injunction was effective.

### III. FINDINGS OF FACT

Viewed in the light most favorable to both Defendants and Relief Defendants, the Court

finds the following facts.[4]

---

[3] For ease of reference, the Court shall refer to the aforementioned corporate Defendants collectively as "IMC." However, where discussion of a particular entity is relevant, the Court shall refer to that specific entity's name.

[4] The Court notes that it found facts for purposes of issuing the statutory restraining order, the preliminary injunction, and the amendment to the preliminary injunction. However, it is necessary to make certain factual findings anew, given the dispositive nature of this Motion.

In 1991, Defendant Joe Miller Company, Inc. filed a Fictitious Business Name Statement with the State of California stating that it did business under the name IMC Trading, Inc (Pl. Ex. 104 at 6.) The statement identifies Defendant Joseph Finateri as IMC-CA's president and designates Richard Stambul as the registered agent for service. (*Id.*; Pl. Ex. 119 at 2.) IMC-CA's business was purportedly the sale of highly-leveraged investments in precious metals through its telemarketing operations. (Pl. Ex. 104 at 60, 73.) In 1995, Richard Stambul incorporated IMC-NV with Joe Finateri designated as the sole director of the company. (Pl. Ex. 115 at 1.) IMC-NV operated in Nevada for approximately three-and-a-half years, engaging in the same type of business as IMC-CA. (Pl. Ex. 101 at ¶ 9, Pl. Ex. 102.) In October 1998, John Nelson of the Securities Division of the Office of the Secretary of State for the State of Nevada began investigating a complaint the Division received concerning the business practices of IMC-NV. (Pl. Ex. 102 at ¶ 4.) Nelson determined that IMC-NV was not registered with either the National Futures Association or the State of Nevada to sell commodities. (*Id.* at ¶¶ 5-8.) Nelson's investigation led to the entry of a non-consensual Permanent Order to Cease and Desist on December 17, 1998, which prevented IMC-NV from engaging in any further futures telemarketing business in Nevada. (*Id.* at ¶¶ 9-16.)

In the late-summer or early-fall of 1998, IMC-AZ was formed and began its Arizona operations. (Pl. Ex. 111 at 26; Pl. Ex. 116.) On behalf of IMC-AZ, Richard Stambul filed a Profit Certificate of Disclosure with the Arizona Corporation Commission. (*Id.*) On September 10, 1998, IMC-NC was incorporated by Stambul, (Pl. Ex. 112 at 1), and on April 8, 1999, Stambul also incorporated IBS-NC. (Pl. Ex. 113 at 1.) IBS-NC shares office space with Pinpoint Marketing, Ltd., a Florida corporation operated by the Mazuma Trading Group, Inc.

5

(Pl. Ex. 101 at ¶¶ 11, 14, 20.)

IMC-NC, IBS-NC, IMC-NV, and IMC-AZ were incorporated by Stambul, who also served as the registered agent for IMC-CA. (Pl. Ex. 113 at 3; Pl. Ex. 115; Pl. Ex.. 116 at 1; Pl. Ex. 119 at 2.) Finateri is the sole officer of IMC-NV and IMC-CA and an officer of IMC-AZ. (Pl. Ex. 115; Pl. Ex. 119 at 2; Pl. Ex. 116 at 3.) Stein is an officer of IMC-AZ and purports to be Controller of IMC-CA and IMC-NV. (Pl. Ex. 116 at 3; Pl. Ex. 102 at 34, 38; Pl. Ex. 104 at 174.) Stein also purports to be the president of Pinpoint and a director of IMC-NC. (Pl. Ex. 124 at 4; Pl. Ex. 101 at ¶ 14.) Michael Temple was an employee of IMC-CA, IMC-NV, IMC-AZ, and IBS-NC, working primarily in the role of a telemarketer and soliciting customers for the companies. (Pl. Ex. 101 at ¶ 15.) Finateri also solicited customers for IMC-NV, IMC-AZ, and IBS-NC. (*Id.*) The Court also finds that Samuel Kingsfield is the vice president of IMC-NC, director of IBS-Bahamas, manager of IMC-NV, director of IMC-AZ, director of IMC-CA, and owner of Pinpoint. (Ex. 301, Att. C,D,E,F; Ex. 301, Att. A; Ex. 302; Ex. 303; Ex. 308; Ex. 301, Att. K; Ex. 105; Ex. 301, Att. G.) Two customers have testified that Mr. Kingsfield was introduced to them as the senior executive of the entire IMC Common Enterprise. (Ex. 306; Ex. 307.) Kingsfield also led training sessions for telemarketers and coached salespersons on various sales techniques, and maintained an office in North Carolina, where IMC conducted much of its business. (Coffin Decl. at ¶¶ 7-11; Perry Decl. at ¶¶ 3-5.)

Further, the Court finds that Defendants Finateri, Kingsfield, and Stein have served as directors and officers of IBS-Bahamas, as well as having served in their other capacities at IMC. (Ex. 301, Att. A; Ex. 302, Att. B.) The telemarketing scripts discovered at the offices of Pinpoint show that Defendants' telemarketers would introduce themselves to customers as employees of

6

IBS-Bahamas. (Ex. 301, Att. H.) On at least two of the scripts, Defendants modified the scripts'

language by crossing out "IMC" and scribbling over it "IBS." (*Id.*)

There is a significant amount of financial overlap between IBS-NC, Pinpoint Marketing,

and IMC-NV. Throughout 1999, IBS-NC paid Pinpoint large sums of money for "labor" and

"training" and paid Pinpoint's rent on the office space the two companies shared on several

occasions. (Pl. Ex. 101 at ¶ 16.) Beginning in June 1999, IBS-NC assumed the payments on

credit card accounts and car leases previously held by IMC-NV. (*Id.* at 18.)

The evidence also reveals a significant number of transactions between a number of

foreign and domestic bank accounts held by the various Defendants and Relief Defendants.

Based on an analysis of records seized from the offices of IBS/Pinpoint in Charlotte, CFTC

investigator Mary Kaminski compiled a chart tracing the flow of funds between accounts

controlled by the various individuals and entities. These accounts were identified as follows:

(1) Three Bahamian accounts in the names of IBS, DBS, and GBX at Barclays Bank, an

account in the name of IBS at CIBC Bank, two Canadian accounts in the names of GBX

and Johnson Matthey IBS at RBC Dominion Securities, and three accounts in the United

States in the names of Pinpoint Marketing, AJS Enterprises, Inc., and Alan Stein. The

records reflect that these accounts were controlled in whole or in part by Alan Stein. The

main account into which customer funds are deposited is the IBS account at Barclays

Bank.

(2) A Bahamian account in the name of Van Koningsveld at Barclays Bank, a Canadian

account in the name of Van Koningsveld with RBC Dominion Securities, and two

accounts in the United States in the name of Kimberlynn Creek Ranch and Samuel

7

Kingsfield, all of which were controlled in whole or in part by Samuel Kingsfield. There were also two accounts in the United States in the name of Kingsfield Racing and Pamela Kingsfield respectively. These accounts were controlled in whole or in part by Pamela Kingsfield.

(3) A Bahamian account in the name of the Joe Miller Company with Barclays Bank and an account in the United States in the name of Joseph and Darlene Finateri, both of which were controlled in whole or in part by Joseph Finateri.

(4) Two accounts in the United States in the names of FX & B, LLC and Michael Temple respectively, which were controlled in whole or in part by Michael Temple.

(Kaminski Aff. 4/5/00, Ex. 4.) The evidence reviewed and summarized through the Kaminski Affidavit establishes that at least four million dollars were transferred between these accounts between April 1998 and March 2000. (Pl. Ex. 101 *at* ¶31.) Customer funds were deposited directly into the IBS account with Barclays Bank in the Bahamas which was controlled by Alan Stein. (Kaminski Aff. 4/5/00, Ex. 4.) From this account, Stein dispersed funds to a number of accounts, most significantly the GBX and DBS accounts with Barclays, the IBS account at CIBC controlled by Stein, and the Von Koningsveld account with Barclays controlled by Samuel Kingsfield. (*Id.*) From account records of the IBS-Bahamas account with Barclays bank, the GBX account with Barclays bank, and the IBS account with CIBC, it is apparent that funds flowed to the following Defendants and Relief Defendants or accounts held in whole or in part by them:

| | |
|---|---|
| AJS Enterprises: | $275,381 |
| DBS: | $106,239 |
| FX&B: | $204,859 |

8

| | |
|---|---|
| GBX: | $739,000 |
| IBS-Bahamas: | $101,680 |
| IBS-NC: | $138,000 |
| Finateri: | $922,364 |
| Joe Miller Co.: | $367,244 |
| S. Kingsfield: | $790,912 |
| (Von Koningsveld acct.) | |
| Kingsfield Racing: | $215,192 (from S. Kingsfield) |
| Kimberlynn Creek Ranch: | $1,005,474 |
| Temple: | $40,566 |
| P. Kingsfield: | $397,708.00 |
| Stein: | $114,918.00 |
| AJS Enterprises: | $159,454.00 |

(*Id.* at ¶ 10; Pl. Ex. 101 at ¶ 31; Pl. Ex. 125 at ¶ 1.) Various Defendants and Relief Defendants diverted these customer funds to pay for personal expenses, and also used IMC credit cards for personal expenses. (*Id.* at ¶¶ 32-35.)

Based on the records of transactions between IMC and its customers between 1998 and 2000, there ought to be $5,209,748.72 of equity held by IMC for its 365 customers. If the commodities purportedly sold were actually possessed and held by IMC, there would be $23,788,806.94 worth of physical metals and other commodities in storage. (Kaminski Aff. 4/5/00 at ¶ 11, Att. 2.) These records relate to transactions and accounts from 1998 through March 2000. Neither Defendants nor Relief Defendants have accounted for the equity or the physical commodities.

As for the actual operation of the individual and corporate Defendants, IMC actively solicited customers through a number of representatives, including Samuel Kingsfield, Joseph Finateri, Michael Temple, and Alan Stein. (Pl. Ex. 103 at 49; Pl. Ex. 105 at ¶¶ 2, 18, 25; Temple Depo. at 82.) IMC-NV also solicited customers through a number of other telemarketer employees, including Robert Dollinger and David Lewandowski between 1996 and 1998, Bill

9

Brannon in 1997, Christopher Layton in 1998, and at various times through salespersons Joseph Pinto, Donna Hyatt, Steve Mayzick, Daniel Sammarone, David Secoy, Candice Angelo, Robert Coffin, Christopher Donovan, Mark Kostner, Geralyn Johnson, Jerry Cosper, and Barry McCullers. (Pl. Ex. 102 at 5-13; Pl. Ex. 103 at 49,65, 75, 84; Pl. Ex. 106 at ¶ 2; Pl. Ex. 107 at ¶ 2; Pl. Ex. 108 at ¶ 2; Pl. Ex. 109 at ¶ 2; Pl. Ex. 111 at ¶ 2; Pl. Ex. 108 at ¶ 18; Pl. Ex. 109 at ¶ 27; Pl. Ex. 110 at ¶ 2.)

IMC solicited potential customers by offering them an investment in precious metals, with payment based on a 20-percent down payment and a loan for the balance, purportedly financed through Amitex Investment Services ("Amitex") and later through IBS-Bahamas. (Pl. Ex. 105 at ¶¶ 2-3 Pl. Ex. 106 at ¶ 6; Pl. Ex. 107 at ¶ 4; Pl. Ex. 108 at ¶¶ 3, 32; Pl. Ex. 109 at ¶ 3; Pl. Ex. 110 at ¶ 3; Pl. Ex. 111 at ¶ 3; Kaminski Aff. 4/5/00, Ex. 1 at 3.) IMC representatives regularly told potential customers that had the individual invested the last time the representative called, the individual could have made substantial profits in the interim, anywhere from 40 to 50-percent and as high as 150 percent, even though some individuals did not recall having spoken previously to anyone from IMC. (Pl. Ex. 106 at ¶¶ 2-3; Pl. Ex. 107 at ¶ 2; Pl. Ex. 108 at ¶¶ 2, 4; Pl. Ex. 110 at ¶ 2; Temple Depo. at 189.) Once a potential customer decided to invest money in a commodity through IMC, they were told that Amitex or IBS-Bahamas would store the metals and other commodities as collateral for the loan. (Pl. Ex. 105 at ¶ 3; Pl. Ex. 106 at ¶¶ 24, 33; Pl. Ex. 108 at ¶ 32.) IMC made various representations to potential customers; generally those representations indicated that investing in silver at that time was an extraordinary opportunity as silver prices were poised to increase substantially over a short period of time. (Pl. Ex. 105 at ¶ 4; Pl. Ex. 102 at 9-10; Pl. Ex. 106 at ¶ 3; Pl. Ex. 107 at ¶ 2-3 Pl. Ex. 109 at ¶ 2; Pl. Ex. 110 at ¶ 2;

10

Pl. Ex. 111 at ¶ 2.) Even if customers declined the representative's initial solicitation, the company followed up regularly and repeatedly, continuing to make representations that the price of silver would increase substantially over a short period of time and the customer should invest quickly. (Pl. Ex. 105 at ¶ 5; Pl. Ex. 106 at ¶ 4; Pl. Ex. 107 at ¶¶ 3, 4; Pl. Ex. 108 at ¶ 5; Pl. Ex. 109 at ¶ 3; Pl. Ex. 111 at ¶¶ 3, 4, 5.)

When a customer decided to invest with IMC, telemarketers instructed the customer to wire the initial 20 percent equity investment immediately to an IMC bank account. (Pl. Ex. 102 at 10-11; Pl. Ex. 106 at ¶¶ 7, 20; Pl. Ex. 107 at ¶ 5; Pl. Ex. 109 at ¶ 4; Kaminski Aff. 4/5/00, Ex. 1 at 11.) The company did not sell standardized amounts at set prices; instead selling what the customer could afford to purchase at the price set by the fluctuating market with a $1,000 minimum. (Finateri Test. 4/19/00 at 89-90.) Only after they made their initial investment did IMC send its customers information booklets, agreements, and risk disclosure statements. (Pl. Ex.. 106 at ¶ 8; Pl. Ex.. 107 at ¶¶ 6-7; Pl. Ex. 108 at ¶ 7; Pl. Ex. 109 at ¶ 5; Pl. Ex. 111 at ¶¶ 7-8.) Existing customers also regularly received calls from IMC telemarketers encouraging them to invest additional money in silver, upon various representations, including that silver was at or near historic lows and would rebound sharply over a short period of time, that the stock market was extremely overpriced and that a correction would occur soon, that dollar and interest rate fears would drive silver prices higher, that the company representative had just purchased silver for his own account, and that Warren Buffet's recent acquisition of interests in silver would drive up prices significantly. (Pl. Ex. 105 at ¶¶ 13-14, 15-16, 20-21, 25-26, 30-31; Pl. Ex. 106 at ¶¶ 3, 20, 27; Pl. Ex. 107 at ¶¶ 8, 11, 14, 18, 22-23, 25-26, 27, 30, 31, 32, 33, 34, 38, 40, 41 , 42; Pl. Ex. 108 at ¶¶ 22, 24, 26, 28, 33, 49; Pl. Ex. 109 at ¶¶ 6-7, 11, 27, 30; Pl. Ex. 110 at ¶¶ 6, 60, 62;

11

Pl. Ex. 111 at ¶¶ 9, 18, 24, 26, 35, 53.)

Standard IMC sales scripts dictated that telemarketers represent to customers that although silver prices were currently stagnant or decreasing, silver was expected to reach $10 to $15 per ounce in the upcoming months or rise to $40 to $50 per ounce in the near future. (Pl. Ex. 105 at ¶ 28; Pl. Ex. 106 at ¶¶ 3, 5, 10, 20, 27; Pl. Ex. 109 at ¶¶ 15, 17, 30; Pl. Ex. 110 at ¶ 12; Kaminski Aff. 4/5/00, Ex. 1 at 12; S. Kingsfield Test., 5/12/00 at 26.) One IMC telemarketer even told a customer that silver prices could soar to as much as $400 per ounce in a matter of months. (Pl. Ex. 105 at ¶ 30.) IMC also regularly solicited existing customers and potential customers to invest in other commodities including gold, crude oil, heating oil, platinum, and palladium, again urging customers to act quickly based on the same types of representations for which they urged silver purchases: dramatic price upswings in coming months due to factors including miners' strikes, the Asian financial crisis, the presidential impeachment scandal, and an impending war between the United States and Iraq. (Pl. Ex. 105 at ¶ 30-31; Pl. Ex. 106 at ¶¶ 9, 23; Pl. Ex. 109 at ¶ 19, 25; Pl. Ex. 110 at ¶ 16, 49, 58; Pl. Ex. 111 at ¶ 16.)

In some instances, customers state that they were never told that they had the option to pay for their metal in full and take delivery. (Pl. Ex. 108 at ¶ 54; Pl. Ex. 109 at ¶ 3; Pl. Ex. 110 at ¶ 3.) Generally, when customers inquired about taking delivery of his/her metal, IMC representatives strongly discouraged the customer from doing so, stating that storage and delivery costs were high and even representing to some customers that "no one takes delivery," that "it is not done that way," and that "it did not make sense to take delivery."[5] (Pl. Ex. 106 at ¶ 13, 15,

---

[5] Defendants have offered evidence of only seven instances in which IMC provided customers with physical commodities after being requested to do so. Those instances are as follows: 1) 300 ounces of silver to IMC customer Greg Macchiavernia, shipped on 10/26/95 and

12

33; Pl. Ex. 107 at ¶ 4.) In contrast, Defendants Kingsfield and Finateri both testified before the Court that IMC was capable of delivering all metal that was sold and had in fact done so upon request. (Finateri Test., 4/19/00 at 92-95; S. Kingsfield Test., 5/12/00 at 14-15.) When asked where the physical commodities were stored, Finateri stated that he had no knowledge of that aspect of IMC's operation, as it was Kingsfield's role at IMC to handle and store commodities. (Finateri Test., 4/19/00 at 67-68) Remarkably, when Mr. Kingsfield was asked where the metal was stored, he stated that he knew IBS stored metal on behalf of customers, but that he did not know where or how much metal was stored by IBS. (S. Kingsfield Test., 5/12/00 at 18-19.) However, no warehouse receipts or other indicators of actual purchase and storage of metal or other commodities by the IMC Common Enterprise on behalf of customers was offered into evidence by any party.

At times, IMC would issue an "equity call" on a customer's account, which required the customer to forward funds to cover the equity call or have those positions liquidated. In such cases, IMC's practice was to encourage customers to invest additional funds in silver or other commodities on the forecast that the market would rebound strongly in a short period of time. (Pl. Ex. 105 at ¶¶ 7-8, 11-12, 22-23, 25-29; Pl. Ex. 106 at ¶¶ 12-14, 15-16, 17-18, 19, 25-26, 31-32, 34-35, 39; Pl. Ex. 107 at ¶¶ 9-10, 12-13, 16-17, 19, 20-21, 35-36, 37-38; Pl. Ex. 108 at ¶¶ 10-11, 12-13, 14-15, 16-17, 18-19, 20-21, 29-31, 35-36, 41-42, 43, 44; Pl. Ex. 109 at ¶¶ 9-10, 13-

---

on or about 11/22/95 (Subm. Add. Evid.of 5/25/00, Ex. 3); 2) 1,000 ounces of silver to IMC customer J. Kenneth Willison on 6/26/96. (*Id.*, Ex. 4); 3) 1,000 ounces of silver IMC customer John J. Bonk on 12/4/95 (*Id.*, Ex. 5.); 4) 200 ounces of silver to IMC customer Dan Blackman on 12/4/95 (*Id.*, Ex. 6); 5) 1,000 ounces of silver to IMC customer Kenneth Reed on 8/1/96 (*Id.*, Ex. 7); 6) 800 ounces of silver to IMC customer Wayne Schell on 9/22/94 (*Id.*, Ex. 10); 7) 1 ounce of gold bullion to IMC customer Robert Huang on 10/17/94. (*Id.*, Ex. 11.).

14, 21-22, 29; Pl. Ex. 110 at ¶ 7-8, 9-11; 14-15, 20-21, 22-23, 24-25, 26-27, 28-29, 31-32, 33-34, 35-36, 37-38, 39-40, 41-42, 43-44, 51-52, 64-6566-67, 68-69; Pl. Ex. ¶¶ 11-12, 13-14, 22-23, 29-30, 31-32, 43-44, 52; Finateri Test. 4/19/00 at 55-56.) IMC customers were charged an administrative fee of four to five percent per transaction, a premium of $0.45 per ounce for precious metals, approximately $41 per month for storage of the metal, an interest rate as high as 10.25% on the loan through IBS, for total fees of approximately 40 percent of the customer's initial investment. (Pl. Ex. 105 at ¶ 35; Pl. Ex. 109 at ¶ 43; Finateri Test., 4/19/00 at 55-56, 95-98.) IMC also frequently liquidated a portion of a customer's position in silver without first contacting the customer. (Pl. Ex. 108 at ¶¶ 38-40, 48; Pl. Ex. 109 at ¶ 32; Pl. Ex. 111 at ¶ 20, 28; Habeck Decl. at ¶ 27-28.) When a customer expressed hesitation to an IMC telemarketer about investing additional funds or if he indicated a desire to close his account, another representative of IMC, often Defendants Finateri or Kingsfield, would interrupt or return the customer's call in an attempt to ease the customer's concerns and encourage further investment. (Pl. Ex. 106 at ¶¶ 10, 17, 22, 33, 40; Pl. Ex. 107 at ¶¶ 3, 4; Pl. Ex. 111 at ¶ 48.) Furthermore, there is no evidence before the Court that any IMC customer ever made a profit upon closing their account. (Finateri Test. 4/19/00 at 92-93.)

In December 1998, customers received correspondence from Defendant Stein indicating that IMC-NV had been purchased by IBS. (Pl. Ex. 107 at ¶ 28; Pl. Ex. 108 at ¶ 45; Pl. Ex. 109 at ¶ 35; Pl. Ex. 110 at ¶ 78; Pl. Ex. 111 at ¶ 38.) When customers attempted to call an IBS representative at a Bahamian phone number, they were told the representative was unavailable, were asked to leave a message, and then received a return phone call from the representative who stated that he was calling from the Bahamas. (Pl. Ex. 107 at ¶ 29; Pl. Ex. 108 at ¶ 46; Pl. Ex. 109

14

at ¶ 36; Pl. Ex. 111 at ¶ 45.) However, the return phone calls were not generally made from the Bahamas, but rather from Charlotte, North Carolina. (Temple Depo. at 158-160, 165-169.) In fact, the evidence shows that IBS-Bahamas was actually a sham corporation that operated through A.S.A.P. Services, Ltd. (Pl. Ex. 101 at 23.) A.S.A.P.'s web-site proclaims:

> A.S.A.P. Services Ltd. created the corporate Headquarters Program so you can prove your corporation is a legitimate Bahamas business. Tour Headquarters Program establishes a complete corporate base. You get an office building with employees [sic] that greet your corporation's visitors and handle telephone communications on a personal basis. A.S.A.P. employees are your employees when someone calls or stops in to see your company. You have a well-equipped full service mail room and private mailbox. We accept your incoming mail and handle it according to your instructions. You can send your original mailings from your Bahamas office and re-route to any destination with your Bahamas return address and a Bahamian postmark. You will have a local bank account which provides a paper trail of your business transactions in the Bahamas.

(Pl. Ex. 101 at 30; http://www.asapbahamas.com/corp.html.) Further, there is a clear flow of funds from the IBS central customer account at Barclays bank to an A.S.A.P. account in the Bahamas and a personal account in the United States belonging to Charles E. Myers, Director of International Business for A.S.A.P. (Kaminski Aff., 4/5/00 at ¶ 10, Ex. 4.) IBS-Bahamas is purportedly located in Nassau, Bahamas, where it occupies a portion of a 20,000 square foot office building. (Finateri Test. at 48-49). The company also purportedly has about 15 Bahamian employees, has been in business about a decade, and handles the "wholesale" end of the operation. (*Id.* at 49-50.)

The CFTC filed various IMC telemarketer sales scripts. The scripts generally included a pattern statement that someone with IMC had called previously and that silver had risen substantially in the interim. (Pl. Ex. 103 at 90, 92, 93, 95; Kaminski Aff., 4/5/00, Ex. 1 at 4, 5,

12.) The sales scripts filed in Nevada ask for the potential customer's permission to first send information and brochures for the customer to review. (Pl. Ex. 103 at 90, 92, 93, 95.) The North Carolina scripts refer to a package that was mailed by a junior broker or one that is on the way to the potential customer. (Kaminski Aff., 4/5/00, Ex. 1 at 6.) One script from the North Carolina office lists "Three Reasons Why a Steep Rise in the Price of Silver is Almost a Mathematical Certainty" and includes the statement, "At today's extremely low levels, we can safely 'hoard' silver in the futures market like millionaires collect rental properties," with the word "futures" crossed through. (*Id.* at 9.)

## IV.  LAW AND ANALYSIS

In its Complaint the CFTC alleges, pursuant to the Act, claims of fraud in connection with the offer or sale of futures contracts and the sale of futures contracts on a non-contract market.  It now moves the Court for summary judgment on each of those claims, seeking a permanent injunction, disgorgement, restitution, and civil penalties.  Having reviewed the claims, the facts of this case, and the arguments submitted, the Court concludes that the CFTC is entitled to summary judgment on its claims.  Therefore, the Court will address the relevant inquiries with respect to each claim, and shall then address the relief demanded.

### A.  Threshold questions

#### i.  Futures contract

As a threshold to the examination of the CFTC's claims, the Court must determine whether Defendants' conduct constitutes trading in a "futures contract" such that they are subject to the requirements of the Act.  For this determination, the Court shall rely on its extensive discussion of the issue in its prior Order of June 21, 2000, pages 22-30.  Of course, the Court's

Case 3:00-cv-00103-RLV   Document 313   Filed 09/04/03   Page 16 of 46

examination of the issue in that Order was based only on the evidence before it at that time and was engaged in only for the purpose of establishing whether the CFTC and this Court had jurisdiction over the matter. However, no new evidence has been submitted during discovery which gives the Court any reason to alter its conclusion in its prior Order for purposes of the instant Order. It is still readily apparent that the subject matter of the transactions at issue in the instant case fall squarely within the definition of "futures contracts" as interpreted by various courts. Thus, there exist no genuine issues of material fact to be determined in this regard, and the CFTC is entitled to summary judgment on the issue.

### ii. Common enterprise

The Court must next determine whether the entity which, for ease of reference, the Court has been referring to as IMC is actually a common enterprise for purposes of liability under the Act. When determining whether a common enterprise exists, courts should look at the totality of the circumstances, including common control, sharing of office space, whether business is transacted amongst the related companies, commingling of funds between the various entities, and any other evidence revealing that there is no real distinction between the companies. *Commodity Futures Trading Comm'n v. Noble Wealth Data Information Serv., Inc.*, 90 F.Supp.2d 676, 691 (D. Md. 2000). The result of such a finding is that all individual entities in the common enterprise are jointly and severally liable for the injuries caused by violations committed by any member of the common enterprise. *Id.*

Having reviewed the facts of this case, the Court concludes that IBS-NC, IMC-NC, IMC-AZ, IMC-CA, Pinpoint, and IBS-Bahamas constitute a common enterprise. They share common officers and directors in Defendants Stein (Pl. Ex. 101 at ¶ 14; Pl. Ex. 102 at 34, 38; Pl. Ex. 104

17

at 174; Pl. Ex. 116 at 3; Pl. Ex. 124 at 4), Kingsfield (Ex. 301, Att. C,D,E,F; Ex. 301, Att. A; Ex. 302; Ex. 303; Ex. 308; Ex. 301, Att. K; Ex. 105; Ex. 301, Att. G), and Finateri (Pl. Ex. 115; Pl. Ex. 119 at 2; Pl. Ex. 116 at 3.). All customer funds received from any of the named entities were deposited into a single account at Barclays Bank in the Bahamas. (Kaminski Aff. at ¶ 10, Att. 4 at 1; S. Kingsfield Test., 5/12/00 at 32.) The entities shared employees, who migrated along with the various IMC/IBS entities. (Temple Depo. at 97-103; 128-32, 140-43.) Each entity was engaged in the same business of selling futures contracts, and each conducted business by means of telemarketing operations. Neither Defendants Stein, Finateri, or Kingsfield, nor IMC telemarketers made any effort to identify the company as anything other than "IMC" or "IBS." (Pl. Ex. 301 at 41-59 (various sales scripts and business cards referring to the organization as IMC or IBS).)

Having considered these factors, the Court concludes that the IMC and IBS entities in fact constitute a common enterprise for purposes of the Act, and that the entities shall be jointly and severally liable for any damages caused for violations of the Act.

### iii. Controlling person liability

The CFTC argues that Defendants Finateri, Stein, and Kingsfield are "controlling persons" of IMC, as that term is defined in 7 U.S.C. §13c(b). Such a finding by this Court would result in the imputation of liability for fraudulent conduct from IMC to the above-named individual Defendants. Because "controlling person" liability affects both of the CFTC's causes of action with respect to the above-named individual Defendants, it is logical for the Court to examine the issue as a threshold matter.

Title 7, United States Code, section 13c(b) provides that

18

> [a]ny person who, directly or indirectly, controls any person who has violated any provision of [the Act]...may be held liable for such violation...In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

Thus, if an officer, director, or any other person induces the corporation's employees to commit a violation of the Act, that "controlling person" may be held liable as if he committed the violation himself. In order to hold a defendant liable under the "controlling person" theory, the CFTC must show that the defendant "actually exercised general control over the operation of the entity principally liable" and that the defendant had the power to control the transaction upon which the violation was based, even if the power was not wielded in the particular transaction at issue. *Commodity Futures Trading Comm'n v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002). Finally, the Fourth Circuit has found that controlling persons are only liable for violations that occurred during the period that they were controlling persons, but not for any violations that occurred before they became controlling persons or after they ceased being controlling persons. *Id.* at 333 n.5.

Having examined the facts of the case, the Court concludes that the CFTC has carried its burden of proving that Defendants Finateri, Stein, and Kingsfield were controlling persons with respect to various entities within IMC. Defendant Finateri is the sole officer of IMC-NV and IMC-CA and an officer of IMC-AZ. (Pl. Ex. 115; Pl. Ex. 119 at 2; Pl. Ex. 116 at 3.) In addition, Finateri was and represented himself as a founder and owner of various IMC entities. (Temple Depo. at 137.) Further, Finateri testified that he participated in the telemarketing business of IMC-NV, IMC-AZ, and IBS-NC, operating with a list of between 300 and 400 clients and also writing and approving scripts for IMC telemarketers. (Trans. 4/19/00 at 47.) Finateri was in a

19

supervisory role over all IMC employees. (Temple Depo. at 29, 45-48.) He also controlled the administration of a Joe Miller Company bank account into which IMC customer money was wired. (Kaminski Decl.of 4/4/00 at 5, Ex 4.) Furthermore, Finateri served in all of these capacities with IMC from 1992 until 2000. (Temple Depo. at 28-29, 164.) Based on the foregoing evidence, the Court concludes that, for the period 1992-2000, Defendant Finateri exercised general discretionary power over the operations of various entities in the IMC Common Enterprise, and was thus a controlling person for that period.

Defendant Stein is an officer of IMC-AZ and Pinpoint Marketing, a director of IMC-NC, and purports to be Controller of both IMC-CA and IMC-NV. (Pl. Ex. 101 at ¶ 14; Pl. Ex. 102 at 34, 38; Pl. Ex. 104 at 174; Pl. Ex. 116 at 3; Pl. Ex. 124 at 4.) Stein also represented himself as a general owner of IMC Common Enterprise. (Temple Depo. at 137.) As a controller, Stein's main functions were handling IMC accounting, payroll, preparing taxes, the oversight of bank accounts. (Pl. Ex. 124 at 4; Pl. Ex. 101 at 11 (summarizing various transactions, the accounts checks were written from, and who signed those checks); Temple Depo. at 83; Coffin Decl. at 6.) However, he also regularly wrote and approved the scripts for telemarketers, hired and fired employees, and supervised employees. (Temple Depo. at 29, 128-29.) Stein took an active role in the conducting of business, confirming deals made and closed by various telemarketers. (Temple Depo. at 81) He also determined when to issue an equity call on a customer's account. (Temple Depo. at 87-89.) Furthermore, Stein performed these functions from approximately 1992 to 2000. (Temple Dep. at 27-29.) Based on the evidence presented to the Court, it is apparent that Alan Stein exercised general control over all facets of IMC Common Enterprise operations from 1992 to 2000, and is thus a controlling person for that period.

20

Defendant Kingsfield was the vice president of IMC-NC and director of IBS-Bahamas, IMC-AZ, and IMC-CA. (Ex. 301, Att. C,D,E,F; Ex. 301, Att. A; Ex. 302; Ex. 303; Ex. 308; Ex. 301, Att. K; Ex. 105; Ex. 301, Att. G.) Two customers testified that Mr. Kingsfield was introduced to them as the senior executive of IMC. (Ex. 306; Ex. 307.) At least one employee referred to him as "the boss." (Coffin Decl. at 5.) He supervised the hiring and firing of employees (*Id.* at 1), distributed sales scripts to telemarketers (*Id.*), and oversaw and controlled the main bank account into which customer money was deposited. (Pl. Ex. 126 at 5, Att. 4.) Further, Kingsfield also actively contacted customers for the purpose of inducing sales, and also closed deals with customers. (Temple Depo. at 37.) Together with Defendants Stein and Finateri, Kingsfield had authority to determine whether to issue an equity call on a customer. (Coffin Decl. at 8; Temple Depo. at 87-89.) Kingsfield took an active role in determining the "market" price for silver--a determination that varied depending on the type of customer. (Coffin Decl. at 9.) Finally, Kingsfield engaged in all of these activities from at least 1992 to 2000. (Temple Depo. at 27-29.) Considering the evidence before it, the Court must conclude that Kingsfield exercised the requisite control over all operations of IMC such that he qualifies as a controlling person for purposes of the Act from 1992 to 2000.

The Court concludes that Defendants Finateri, Stein, and Kingsfield are controlling persons of IMC for purposes of the Act for the period 1992 to 2000. Thus, pursuant to 7 U.S.C. § 13c(b), said Defendants shall be jointly and severally liable for any violations of the Act committed by IMC that occurred during the period 1992 to 2000. The Court shall grant summary judgment in favor of the CFTC on that issue.

21

*B. 7 U.S.C. § 6b(a)--Fraud in connection with the offer or sale of futures contracts*

In order to prevail on a cause of action for fraudulent offer or sale of futures contracts, a plaintiff must show that a defendant 1) made misrepresentations or omissions 2) of material fact 3) with scienter.[6] *E.g., Commodity Futures Trading Comm'n v. Noble Wealth Data Information Serv., Inc.*, 90 F.Supp.2d 676, 685 (D. Md. 2000). Misrepresentations or omissions are judged in light of the "overall message" and the "common understanding of the message conveyed." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). The CFTC may prove materiality by showing that there is a substantial likelihood that a reasonable investor would consider the information important when making an investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group, Inc.*, 874 F.Supp. 1345, 1354-55 (S.D. Fla. 1994) (applying Securities Exchange Act standard of materiality in a commodity futures case). Furthermore, a defendant may not use the dissemination of a risk disclosure statement as "advance exoneration of fraudulent conduct." *JCC Inc. v. Commodity Futures Trading Comm'n,* 63 F.3d 1557, 1570 (11th Cir. 1995). Thus, a defendant may not "cure" a knowing misrepresentation of a material fact by providing a disclosure of the risks inherent in the disclosure, especially where the misrepresentation specifically contradicts the risk disclosure

---

[6] The Court notes that the prima facie case in an enforcement action differs from the prima facie case in an action brought by an individual. Where the case is brought by an individual, the individual must prove: 1) material misrepresentations; 2) made with scienter; 3) intent to induce reliance upon the misrepresentations; and 4) actual reliance. *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group,* 874 F.Supp. 1345, 1354 (S.D. Fla. 1994). The CFTC need not prove actual reliance because "[i]n an enforcement action, it is the actions of the defendant that are at issue, not the reliance or damage to particular customers. The fortuity of certain customers not to believe a broker's misrepresentation should not work to the advantage of one responsible for such misdeeds." *Id.* at 1355.

22

statement. *Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999). Scienter may be proved in either of two ways: 1) by demonstrating that the defendant knew his representations were false and that the representations were intended by the defendant to cause harm, or 2) by showing that the defendant made the representations with reckless disregard for their validity. *Id.* at 686.

Moving to the CFTC's case, the Court concludes that it has carried its burden with respect to each defendant, and that there exist no genuine issues of material fact as to any element of the CFTC's prima facie case.[7] First, it is clear that Defendants, as well as IMC telemarketers as directed by Defendants Finateri, Stein, and Kingsfield, made misrepresentations and omissions when selling futures contracts.[8] The most glaring misrepresentation is that IMC *never* bought or held silver or other commodities--which it clearly promised to do--for its customers during the period from 1992 to 2000. (Temple Depo. at 80, 127; Trans. 5/12/00 at 18-21; Trans. 4/19/00 at 67.) When asked who would have knowledge of where approximately $24,000,000 of silver and other metals were being stored for customers, both Defendants Finateri and Kingsfield referred to each other as the ones who would have knowledge about the location of the metals. (Trans. 5/12/00 at 18-21; Trans. 4/19/00 at 67.) However, no Defendants have ever presented this Court with any information regarding the location of the metals, despite being ordered by the Court to present any such records of storage of which they had knowledge. (Trans. 5/12/00 at 20-21.) It

---

[7] Of the Defendants that have filed an opposition brief, none make the legal argument that the IMC Common Enterprise did not engage in fraud as that cause of action is defined in the Act.

[8] The Court notes that where it refers to the conduct of IMC, the same conduct is imputed to Defendants, who are liable as controlling persons.

23

is apparent to the Court, and the evidence confirms, that IMC never intended to buy any of the metals which it marketed, and purportedly sold, to its customers. Indeed, the basic premise of the scheme was misrepresentation: Defendants intended for IMC to sell metals that didn't exist, the end result being nearly one hundred percent profit for IMC, and thus, for Defendants.[9]

IMC also made obvious misrepresentations of the market prices for silver, the fluctuations in those prices, and profits to be gained by trading in silver based on wild fluctuations. At least one IMC employee testified that the so-called "market" prices for silver-- which were determined, generally, by Defendants Kingsfield and Stein--were different depending on the type of customer. (Coffin Decl. at 9.) In other words, in addition to the fact that IMC had no intent of actually purchasing metals for its customers, in some cases it was not even selling the metals at their actual market price! IMC also encouraged customers to buy silver based on the mischaracterization of certain current events and those events' effects on the silver market. (Temple Depo. at 70-74, 115-18; Pl. Ex. 301 at 41-56 (sales scripts giving Y2K, inflation, purchases by Warren Buffet, and all-time silver price lows as reasons for buying silver); Habeck Decl. at 2-6 (explaining various "hypes" used by Defendant Kingsfield to encourage one customer to buy silver and gold).) IMC also grossly misrepresented the profit margins that could have been realized by customers had they invested for a specific period beginning several months before any particular telemarketer's call, stating fluctuations which would have resulted in profits of, in at least one case, 150 percent. (Temple Depo. at 189 (150 percent profit), 194 (80 percent

---

[9] As noted before, Defendants did present evidence of seven instances in which IMC delivered physical metals to customers. However, providing seven customers with the object of their bargain fails to account for the nearly four hundred customers for which IMC *never* bought any silver. (Kaminski Aff. 4/5/00 at ¶ 11, Att. 2.)

24

profit).) Research of historical market data reveals, however, that silver prices have never fluctuated to the level necessary to generate the types of profits IMC quoted over such a short period of time. (Pl. Ex. 103 at 95 (sales script quoting price change of silver in 1995 from $4.30 to $6.25 per ounce); Pl Ex. 101 at 20 (summarizing Handy and Harmon price quotation setting silver market price low for 1995 at $4.36 per ounce and high at $6.01 per ounce).)

All of the conduct named above constitutes misrepresentation for purposes of the Act.[10] Therefore, considering the evidence and arguments before it, the Court finds that the CFTC has carried its burden on the issue of misrepresentation.

As to the second element, materiality, the Court concludes that the statements made by Defendants and IMC telemarketers fall squarely within the realm of those that a reasonable investor would consider when deciding whether to invest. Because the examples of material misrepresentations made by the IMC Common Enterprise are numerous, the Court will simply list the most prominent[11]:

1) The sales scripts used by IMC telemarketers contained false statements of past silver prices (Coffin Decl. at 9; Pl. Ex. 101 at 20; Pl. Ex. 103 at 95.);

2) The sales scripts contained false statements of potential profit margins, ranging from 40 percent to 150 percent, and in at least one case, reaching 361 percent (Pl. Ex. 106 at ¶¶ 2-3; Temple Depo. at 189; Iskiw Decl. at ¶ 4);

3) IMC telemarketers strongly discouraged customers from taking physical delivery of

---

[10] The Court notes that these are merely the most apparent and typical of the misrepresentations, and not a specific list of the misrepresentations made to each IMC customer. Daily sales scripts and representations made in individual customer transactions varied wildly. (Pl. Ex. 105-12.) The Court has merely tried to detail some of the typical misrepresentations made by IMC telemarketers to their customers.

[11] Again, as previously stated, these are merely some of the typical misrepresentations that IMC telemarketers made in order to influence customers' investment decisions.

25

metals--and generally would not even allow it-- based on the assertion that "no one takes delivery" and "it is not done that way" (Hoskinson Decl. at 3; Temple Depo. at ; Kriner Decl. at ¶ 3);

4) IMC sales scripts touted Y2K, inflation, silver purchases by Warren Buffet, silver purchases by the soliciting telemarketer, and all-time silver price lows as reasons for buying silver (Temple Depo. at 70-74, 115-18; Pl. Ex. 301 at 41-56);

5) Equity calls and account statements reflected account activity or changes in position which had not actually occurred (Pl. Ex. 105-12).

Each of these misrepresentations pertain to the type of information that reasonable investors would consider when making a decision whether to invest in silver or the other commodities IMC marketed. Current price, price history, and future price indicators are indeed exactly the type of information on which investors do base their investment decisions. The denial of the right to receive physical delivery of metals and the issuance of equity calls are also circumstances that would affect an investor's decision to invest both initially and additionally.

Furthermore, as a matter of law, the fact that IMC issued certain risk disclosure statements does not make the misrepresentations non-material. *E.g.*, *Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999). Not only do the representations made over the phone by IMC telemarketers with regard to risk directly contrast the statements in the risk disclosure statement, but the risk disclosure statements were only provided to a customer *after* wiring funds to IMC for the purchase of metals. Thus, even if the statements of risk over the phone had not directly contradicted those given in the disclosure statement, the risk disclosure was effectively useless to the investor because it was not provided prior to the making of the investment decision.

The Court concludes that the misrepresentations were material, and the CFTC has carried

Case 3:00-cv-00103-RLV   Document 313   Filed 09/04/03   Page 26 of 46

its burden as to this issue.

Finally, the Court concludes that the material misrepresentations were made with scienter. As noted above, the CFTC may prove scienter in two ways. Because the Court concludes that the type of scienter held by Defendants Finateri, Stein, and Kingsfield differs from the type of scienter possessed by Defendant Temple, a dual analysis of scienter is necessary.

As to Defendants Finateri, Stein, and Kingsfield, they had actual knowledge that statements made by IMC employees were false and they intended the making of such false statements to result in loss to customers. Each of these three Defendants was an integral participant in the creation and dispersal of false statements by IMC telemarketers to IMC customers. Each was responsible for creating the misleading sales scripts used by IMC employees. (Trans 4/19/00 at 47; Coffin Decl. at ¶¶ 9-13; Temple Depo. at 29.) Each personally made calls to IMC customers for the purpose of inducing purchases. (Kriner Decl. at 1-11; Weirich Decl. at ¶¶ 2-5; Stock Decl. at ¶¶ 2-6; Coffin Decl. at ¶ 20.) Each individually supervised IMC telemarketers and listened to calls, interrupting where necessary in order to appear more convincing to customers. (Perry Decl. at ¶¶ 4-5; Temple Depo. at 29, 45-48.) Each knew that there were no physical metals being purchased by IMC for customers. (Coffin Decl. at ¶ 28; Temple Depo. at 80, 127; Trans. 5/12/00 at 18-21; Trans. 4/19/00 at 67.) Each determined the appropriate time to issue equity calls for particular customers, and the prices at which to offer them additional metals for purchase. (Coffin Decl. at ¶ 25; Temple Depo. at 87.) Each realized income as a result of the misappropriation of customer funds. (Pl. Ex. 101 at 14-18.) There is no question that these Defendants knew the nature of the misrepresentations being made by IMC; indeed, it was they who reaped the benefit from their customers' losses.

27

Thus, Defendants Finateri, Stein, and Kingsfield possessed scienter for purposes of fraud under the Act.

Defendant Temple, an IMC telemarketer, possessed scienter in that he made the representations suggested to him by Defendants Finateri, Stein, and Kingsfield with reckless disregard for their validity. Temple was employed as an IMC telemarketer several times over a nine-year period. (Temple Depo. at 267). Temple knew that he had never seen the actual metals he was selling, even though he was physically present at least once in the building where the metals were supposedly stored and even though he never saw a bill of lading for any silver or other commodity. (Temple Depo. at 62-63, 77-80, 126-27, 202-04.) Further, with respect to many of the reasons that he was "hyping" silver purchases to customers, Temple could not explain why the reasons might actually be *good*, *valid* reasons to buy silver. (Temple Depo. at 46, 70-72.) In other words, Defendant Temple had essentially no personal knowledge as to why and when market conditions dictated that a customer buy silver, even though he claimed to customers that he had such knowledge. (Habeck Decl. at ¶ 25.) Following the direction of Defendants Finateri, Stein, and Kingsfield, Temple always suggested to customers that it was the appropriate time to buy silver. Any reasonable employee would have the prudence to realize that, over a nine-year period, silver prices were not *always* at an all-time low, there were not *always* miners' strikes in Africa, the United States was not *always* moving troops into Iraq for purposes of going to war, Warren Buffet was not *always* buying silver futures, inflation was not *always* increasing, interest rates were not *always* rising, and the stock market was not *always* extremely overpriced and ready for a corrective decline. (Pl. Ex. 103 at 90 (sales script stating that gold and silver prices would "skyrocket" in 1995 due to fear of inflation, the value of the

28

dollar falling, and the stock market being overpriced), 92 (same sales script, with date changed to 1996), 93 (same script, with date changed to 1997); Pl. Ex. 126, Att. 1 at 15 (same sales script, with date changed to 1998), 34 (citing Warren Buffet's purchases, overpriced stock market, Y2K, inflation, diversification, and all-time lows in silver prices as reasons to buy); Temple Depo. at 147 (stating that the content of sales scripts did not change in any material way over the course of his employment with IMC).)

Defendant Temple simply cannot hide behind the fact that he was following the instructions of his supervisors, as he attempts to do in his opposition brief. Such applies especially where every indication in this case points to the inevitable conclusion that the information given to customers was false and intended to defraud them of their money. Furthermore, Temple's argument on brief that he has been unfairly singled out amongst the mass of IMC telemarketers is unpersuasive. The Court is unaware of, and Temple has not indicated, any law which supports the contention that the provisions of the Act should not be enforced if there are many persons violating it. The fact that other IMC employees were also violating the Act is no defense. Temple is liable for his illegal conduct irrespective of whether the CFTC has joined other telemarketers in this civil enforcement action

The Court thus concludes that Defendant Temple made representations to customers with reckless disregard for their validity. Thus, Defendant Temple possessed the requisite scienter for purposes of the anti-fraud provision of the Act.

Therefore, because the Court has concluded that there is no genuine issue of fact as to any element of the CFTC's claim of fraudulent offer or sale of futures contracts, the Court shall grant summary judgment in favor of the CFTC and against Defendants Stein, Temple, Finateri, and

Kingsfield as to that claim.[12]

### C. 7 U.S.C. § 6(a)--Sale of futures contracts on a non-contract market

In order to prevail on a cause of action for illegal sale of futures contracts under 7 U.S.C. § 6(a), the CFTC must prove only that Defendants sold futures contracts on a market that has not been approved by the CFTC.

The Court has already concluded, in Section IV.A. *supra*, that the transactions entered into by Defendants constituted futures contracts. Furthermore, there is overwhelming evidence that the futures contracts in question were not sold in any type of market at all, but rather telemarketed from IMC "boiler rooms" in California, Nevada, North Carolina, and Arizona. (Ricci Aff. at ¶ 2.) IMC Common Enterprise's main aim was to sell these futures contracts in violation of the Act. Defendant Temple is liable for the violations he committed, as he personally solicited customers. Defendants Finateri, Kingsfield, and Stein, as controlling persons, are liable for the conduct of IMC. However, the Court notes that even absent controlling person liability for Defendants Stein, Finateri, and Kingsfield, each would be independently liable for violating section 6(a) because each personally solicited the purchase of futures contracts over the phone in their roles as IMC telemarketers and "closers."

Therefore, the Court concludes that Defendants Stein, Temple, Finateri, and Kingsfield sold futures contracts in violation of the Act. The Court shall grant summary judgment in favor

---

[12] The Court need only briefly note an argument made by Defendant Kingsfield. In his opposition brief, he argues that the CFTC's motion for summary judgment is impermissibly based on adverse inferences from his and his co-Defendants' invocations of the Fifth Amendment privilege during discovery. The Court has not relied on any adverse inferences from such an invocation in reaching its conclusion, as there is abundant other evidence on which the Court has based its ruling. Thus, Kingsfield's argument is unavailing.

30

of the CFTC on this claim.

## D. Relief

As relief for the Defendants' violations of the Act, the CFTC seeks a permanent injunction, restitution, disgorgement, and civil penalties. The Court will address each request for relief as to each Defendant and as to Relief Defendants.

### i. Permanent injunction

Pursuant to 7 U.S.C. § 13a-1(b), a Court may grant a permanent injunction to prevent a Defendant from engaging in violations of the Act where "there is a likelihood that, unless enjoined, the violations will continue." *Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986). Once a past violation is demonstrated, the CFTC "need only show that there is some reasonable likelihood of future violations." *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). District courts may infer a likelihood of future violations from the defendant's past conduct. *Am. Bd. of Trade*, 803 F.2d at 1251; *Hunt*, 591 F.2d at 1220. Furthermore, where the past violation resulted from "systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future conduct." *Hunt*, 591 F.2d at 1220.

Moving to the instant case, the CFTC seeks issuance of a permanent injunction against Defendants Temple, Stein, Finateri, and Kingsfield. As the Court detailed in Sections IV.B and C, Defendants have committed substantial, systematic violations of the Act in the past. The violations spanned a nine-year period and took place in at least Arizona, California, North Carolina, Nevada, and the Bahamas. It is reasonable to assume that Defendants would have continued to engage in violations of the Act if the Order of this Court had not enjoined them.

31

Further, IMC has previously been issued a permanent cease and desist order by the State of Nevada, in response to which Defendants simply moved out of Nevada and continued operations in other states. (Nelson Decl. at ¶¶ 7-13; Pl. Ex. 102 at 20-21.) There is a substantial likelihood that Defendants would engage in a similar course of action if not enjoined at this time. Thus, because Defendants' past conduct leads to the overwhelming conclusion that the Defendants' conduct requires a severe deterrent, the Court shall enter a permanent injunction against Defendants to accompany this Order.

*ii. Restitution*

Under the Act, Courts may fashion appropriate equitable relief, which may include restitution of any amounts received from investors as a result of violations. *Commodity Futures Trading Comm'n v. Noble Wealth Data Information Serv., Inc.*, 90 F.Supp.2d 676, 692 (D. Md. 2000). In a case requiring restitution, a court should order restitution of the amount invested by customers less any refunds made by the defendant. *Id.* at 693.

In this case, the CFTC urges restitution of $7.7 million in customer funds which were received by the IMC Common Enterprise between 1997 and 1999. Defendants Stein and Kingsfield dispute this estimation on brief, arguing that the calculation is incorrect and based only upon the testimony of Mary Kaminski, the investigating officer for the CFTC enforcement division. Defendant Stein also contends that because he received only a small portion of the entire amount, he should not be liable for the full amount. Both of these arguments lack merit.

There is no reason for the Court to doubt the affidavit of Ms. Kaminski on the point of the correct restitution amount. In coming to the total of $7.7 million, Kaminski extensively reviewed the IMC bank accounts and checks received into those accounts and summarized the voluminous

32

deposits and withdrawals in her affidavit--a review which both Defendants Stein and Kingsfield had the opportunity to make, but failed to conduct. They now seek to challenge the amounts stated by the CFTC, but they offer no evidence of their own as to how or why Kaminski's calculation is an incorrect summary of the bank account transactions that took place. The bald assertion that the CFTC's expert's calculation is incorrect is not enough to forestall summary judgment.

As to Stein's argument that he was merely a figurehead, and received only a small amount of the whole proceeds of the fraudulent scheme, the Court has already concluded that Stein was a controlling person for purposes of the Act. As a controlling person of a common enterprise, Stein is jointly and severally liable for all damages caused by any violations of the Act, regardless of whether he received the benefit of the violations. If Stein desired to avoid joint and several liability for entire scope of IMC's scheme, he should not have acted in the role of a controlling person. Stein's argument is meritless.

Therefore, the Court concludes that Defendants Stein, Finateri, and Kingsfield shall be jointly and severally liable for restitution of the $7.7 million which was received from IMC customers over the period 1997-1999.

*iii. Disgorgement*

Similar to restitution, disgorgement is an equitable remedy that is provided for under the Act. *Id.* Disgorgement is the reasonable approximation of the profits causally connected to the violation. *Id.* The CFTC seeks disgorgement of funds from Defendants Stein, Finateri, Temple, and Kingsfield, as well as Relief Defendants Pamela Kingsfield, Kimberlynn Creek Ranch, Kingsfield Racing, and FX & B.

33

As far as the demand for disgorgement against Defendants Stein, Kingsfield, and Finateri, the Court fails to see--and the CFTC has certainly not demonstrated--how an order of disgorgement would address any profits received by Defendants that would not already be addressed by an order of restitution. Essentially, "the Commission is asking that the salaries and commissions...be counted twice, first as a part of the restitution award, then again as part of the disgorgement award." *Id.* Furthermore, the CFTC has not demonstrated *why* Defendants Stein, Kingsfield, and Finateri received any profits in excess of the amount that was received from customers. Because an order of disgorgement would be duplicative of the Court's restitution order, that request by the CFTC is denied as to Defendants Stein, Kingsfield, and Finateri.

As to Defendant Temple, the CFTC urges an order of disgorgement of the $211,427 that Temple received in salaries and commissions from IMC.[13] The amount demanded consists of the salaries and commissions received by Temple in return for services rendered to IMC. As an award of disgorgement is the appropriate remedy for depriving a wrongdoer of his ill-gotten gains, the Court shall order disgorgement of $211,427, which was the amount received by Temple as a result of the violations he committed.[14]

Finally, as to Relief Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc.,

---

[13] Interestingly, the CFTC does not seek this amount through an order of restitution from Temple, but rather through an order of disgorgement. Presumably this request is based on the fact that Temple did not directly receive customer funds, but rather only received "profits" from his violations to the extent that he was paid commissions and a salary by IMC. However, these are merely the Court's suppositions, as the CFTC does not fully explain its rationale for seeking its relief in this manner.

[14] However, the Court notes that Defendant Temple shall be jointly and severally liable for the $211,427 with Relief Defendant FX & B, as Temple deposited at least some, if not all, of his commissions and salary into the FX & B account. (Temple Depo. at 174.)

34

Pamela Kingsfield, the CFTC seeks disgorgement of $1,288,374, which constitutes certain funds received as salary, commission, and profits from Defendant Kingsfield. As to Relief Defendant FX & B, the CFTC seeks disgorgement of any funds received from Defendant Temple in the form of salaries or commissions. Defendant FX & B does not challenge the CFTC's demand for relief in this regard; however, Relief Defendants Pamela Kingsfield, Kingsfield Racing, Inc., and Kimberlynn Creek Ranch, Inc. (hereinafter collectively "Kimberlynn Creek Entity") have filed a brief opposing disgorgement on the basis that it has a valid claim to the funds in question. It is clear that neither Kimberlynn Creek Ranch, Inc. nor Kingsfield Racing, Inc. has any business relationship with IMC. (Trans. 5/12/00 at 16-17; Kingsfield Aff. at ¶ 9.) The Court shall briefly set forth the law regarding the maintenance of disgorgement actions against relief defendants in general, and shall then address Kimberlynn Creek Entity's arguments.

In appropriate circumstances, the CFTC may bring claims for relief against a nominal, or relief, defendant based solely on the premise that the particular defendant is in possession of property that is the subject of the litigation. *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002). The theory underlying this "obscure common law concept" is that in the interest of affording complete relief to an aggrieved plaintiff, a court may, in the interest of equity, exercise jurisdiction over relief defendants in possession of property that would ensure a plaintiff obtained the relief demanded, even though the relief defendant is otherwise unrelated to the underlying claim. *Id.* at 192. A court may order equitable relief against a relief defendant where the person or entity "1) has received ill-gotten funds; and 2) does not have a legitimate claim to those funds." *Id.* "However, a claimed ownership interest must not only be recognized in law; it must also be valid in fact. Otherwise, individuals...holding

35

funds on behalf of wrongdoers would be able to avoid disgorgement (and keep the funds for themselves) simply by stating a claim of ownership, however specious." *Id.* (parentheses in original).

In the earlier appeal of this Court's issuance of a preliminary injunction, the Fourth Circuit noted that "[w]e have no doubt that the district court will provide the Relief Defendants with an opportunity to demonstrate the existence of a legally and factually valid ownership interest to some or all of the assets prior to ordering disgorgement." *Id.* n.5. Kimberlynn Creek Entity's argument is that it indeed does have a legally and factually valid ownership interest in the funds. This assertion is based on three arguments: 1) that the CFTC has failed to identify any assets held by Kimberlynn Creek Entity which are in reality owned by IMC or the individual Defendants, 2) the funds received from IMC accounts and deposited into various Kimberlynn Creek Entity accounts were Samuel Kingsfield's salaries received from IMC, and 3) the funds received from IMC accounts were Pamela Kingsfield's salary earned by performing certain jobs for IMC. Each of these arguments is meritless.

First, the CFTC has clearly identified the assets which were received by Kimberlynn Creek. Kimberlynn Creek , Inc. received funds in the amount of $632,638 directly from IMC. (Pl. Ex. 125 at1.) Kimberlynn Creek, Inc. received $220,836 from IBS-Bahamas. (*Id.*) Kingsfield Racing, Inc. received $37,192 from IMC. (*Id.*) Pamela Kingsfield received $461 from IMC. (*Id.*) IMC paid $97,707 in personal charges made by Pamela Kingsfield to an IMC corporate credit card. (*Id.*) Pamela Kingsfield received $272,040 from Kimberlynn Creek Ranch, Inc. and $27,500 from Kingsfield Racing. (*Id.*) All of these amounts were identified by CFTC investigator Mary Kaminski after having extensively reviewed and summarized IMC, IBS,

36

and Kimberlynn Creek Entity bank accounts. Relief Defendant Kimberlynn Creek Entity has presented no reason to question Kaminski's analysis, nor any evidence that the income came from a legitimate source. Surely, if Kimberlynn Creek Ranch and Kingsfield Racing had incurred over $1.2 million in profits there would be some records of horse sales or some type of customer lists, at the very least. Kimberlynn Creek Entity has provided none of these, but instead attempts to support its arguments with bald assertions that the money was legitimately earned. The self-interested testimony of Pamela and Samuel Kingsfield is not enough to withstand summary judgment on this issue. The CFTC has adequately stated the amounts transferred between IMC and Kimberlynn Creek Entity.

Kimberlynn Creek Entity also argues that funds received by various Kimberlynn Creek Entity accounts constituted Samuel Kingsfield's salary. Its argument, based on the Fourth Circuit's earlier opinion in this case, is that because Samuel Kingsfield deposited his salary and commissions from IMC into the Kimberlynn Creek Entity accounts for the support of the Kingsfield household generally, that the funds are not subject to disgorgement. *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002). This argument is both meritless and disingenuous. One thing that is painfully obvious to the Court in this case is that Samuel Kingsfield received substantial profits by defrauding IMC customers of money. Regardless of how that ill-gotten profit is characterized--salary, household support, or anything else--and regardless of whether Samuel Kingsfield intended that money for support of his household, it is still subject to disgorgement because it constitutes profits from the fraudulent IMC scheme. Essentially, the Kimberlynn Creek Entity argument is that because Samuel Kingsfield sufficiently laundered his money through Kimberlynn Creek and Kingsfield

37

Racing, the money is not subject to disgorgement.[15] Not only is this argument legally worthless, it is also preposterous.

Kimberlynn Creek Entity further argues that money received by Pamela Kingsfield from IMC in the form of salary in exchange for services performed and in the form of free personal use of an IMC corporate credit card is not subject to disgorgement. To the extent that Pamela Kingsfield performed *legitimate* services for IMC, those funds would not be subject to disgorgement. However, she has produced no evidence, other than her own self-serving testimony, that she ever performed *any* services for IMC from the period 1997 to 1999. She did testify that she worked "on and off" for IMC from 1992 through 1994. (Pamela Kingsfield Depo. at 46.) Furthermore, it appears that whatever services she did perform for IMC were closely related to the illegal futures scheme. (Temple Depo. at 52, 53, 81, 98, 99, 106.) To the extent any funds were received by Pamela Kingsfield from IMC, such funds must be disgorged. As to the $97,707 in personal credit card charges on the IMC corporate card made by Ms. Kingsfield, such funds are also subject to disgorgement. Pamela Kingsfield argues that "it was her understanding that those personal expenses [from the IMC corporate credit card] would be deducted from Samuel Kingsfield's pay." (St. of Facts in Opp. to Pl. Mot. for Summ. Judg. at ¶ 10.) Again, Samuel Kingsfield's "pay" was in fact his share of fraudulently obtained customer funds, so the fact that she believed the amounts would be deducted from Samuel Kingsfield's pay does not in any way change the character of the funds nor the fact that they are subject to

---

[15] The Court is aware that money laundering is accomplished by passing illegally-obtained money through multiple legal entities for purportedly legitimate uses. The Court was unaware, however, that doing a "good job" of money laundering was a legal argument against disgorgement.

disgorgement.

As far as the funds received by Pamela Kingsfield from Kimberlynn Creek Ranch, Inc. and Kingsfield Racing, Inc., the CFTC has not sufficiently established that the funds were anything other than Ms. Kingsfield's salary for the services she performed for Kingsfield Racing and Kimberlynn Creek Ranch. It appears that Kingsfield Racing and Kimberlynn Creek Ranch did engage in at least *some* boarding, breeding, and training of horses. (Pamela Kingsfield. Depo., Ex. 8 (checks totaling approximately $28,937.60 written from Kingsfield Racing to various other entities, including a veterinarian.) It is, however, equally apparent that Pamela Kingsfield took a great deal of money out of the Kimberlynn Creek Entity for her own personal use, whether it be for salary or otherwise. (*Id.*, Ex. 7 ($104,300 in checks written from Kimberlynn Creek Ranch's general account payable to Pamela Kingsfield, drawn over a period of late January to early November 1998); *Id.*, Ex. 8 ($29,000 in checks written from Kingsfield Racing's general account to Pamela Kingsfield, drawn over a period from early March to late August 1999).) The CFTC has not carried its burden of showing that there is no genuine issue of material fact as to the amounts Pamela Kingsfield actually earned as wages for her work as manager or officer of Kimberlynn Creek Entity as opposed to the amount of illegally obtained funds that were merely laundered through Kimberlynn Creek Entity and then passed along to Ms. Kingsfield.

Therefore, the Court concludes that at this time the evidence is insufficient to order disgorgement of any funds received by Pamela Kingsfield from Kimberlynn Creek Ranch, Inc. and Kingsfield Racing, Inc. However, the Court does note that, upon a proper showing or clarification of evidence by the CFTC, an award of disgorgement would be appropriate at the

summary judgment level. The Court, acting pursuant to Rule 56(d), shall reserve ruling on the specific issue of the amount of disgorgement necessary to adequately address the profits received by Pamela Kingsfield. Also pursuant to Rule 56(d), the Court shall order that further evidence and briefs be submitted by Pamela Kingsfield and the CFTC addressing the amount that Pamela Kingsfield received as legitimate income from her business ventures as opposed to the amount of ill-gotten funds she received through Kimberlynn Creek Entity as a result of IMC's fraudulent scheme.

To summarize, as to Defendant Temple and Relief Defendants, the Court reaches the following conclusions regarding disgorgement liabilities:

| Defendant/Relief Defendant | Funds Received From: | Amount |
|---|---|---|
| Pamela Kingsfield | 1) IMC Common Enterprise | 1) $461 |
| | 2) IMC Common Enterprise Personal Credit Card Charges | 2) $97,707 |
| | **Total** (excluding amounts received from KCR and KR, to be determined) | **$98,168** |
| Kimberlynn Creek Ranch, Inc. | 1) IMC Common Enterprise | 1) $632,638 |
| | 2) IBS-Bahamas | 2) $220,836 |
| | **Total** | **$853,474** |
| Kingsfield Racing, Inc. | 1) IMC Common Enterprise | 1) $37,192 |
| | **Total** | **$37,192** |
| Michael Temple & FX & B, Inc. (jointly and severally liable) | 1) IMC Common Enterprise | 1) $211,427 |
| | **Total** | **$211,427** |

*iv. Civil monetary penalties*

Pursuant to 7 U.S.C. § 6c(d)(1), the CFTC seeks imposition of civil monetary penalties against Defendants. Under the Act, courts may impose a civil monetary penalty "of not more than the higher of $110,000...or triple the monetary gain to the person for each violation." 7 U.S.C. § 6c(d)(1). In determining an appropriate civil monetary penalty, courts should evaluate the seriousness of the violation to arrive at an appropriate amount. *JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557, 1571 (11th Cir. 1995). If the violating conduct offends the very core purposes of the Act, manipulating prices or defrauding customers, then such conduct generally warrants the imposition of a civil monetary penalty. *Id.* The defendant's particular culpability and intent are to be considered in determining a penalty, as well as the direct harm to customers and whether the violation was merely an isolated instance or a recurring malfeasance. *Id.* However, the Court is free to consider other mitigating factors in making its determination.

Having taken these factors into consideration, the Court concludes that the violations committed by Defendants were repeated, systematic, intentional and exhibited complete and utter disregard for the financial condition of IMC customers. The scheme had no aim other than the misappropriation of client funds. Defendants Stein, Finateri, and Kingsfield are particularly culpable not only in that they created the system of fraud, but also in that failed to discontinue their fraudulent activities even after being issued a cease and desist order by the State of Nevada. They simply moved to another state so that they might further defraud IMC customers. Such action deserves the harshest monetary penalty available. Therefore, the Court shall impose a penalty triple the monetary gain of Defendants, calculated as follows and to be paid only after

41

satisfying the Court's order of restitution:

> 1) Kingsfield shall pay to the CFTC a penalty of $4,048,296, which is triple the sum of the profits attributed to Kingsfield, Pamela Kingsfield, Kingsfield Racing, Inc., and Kimberlynn Creek Ranch, Inc.;

> 2) Stein shall pay to the CFTC a penalty of $1,041,456, which is triple the sum of the profits attributed to Stein and AJS Enterprises;

> 3) Finateri shall pay to the CFTC a penalty of $2,264,850, which the triple the sum received by Finateri from IMC.

As to Defendant Temple, the Court determines that a civil monetary penalty is inappropriate, given that Defendant Temple appears to have had limited knowledge of the scope and manner of the overall operations of IMC and profited the least of the Defendants in this case--apparently less than some other IMC telemarketers as well. (Temple Response Brief of 5/28/02 at 2.) Of the individual Defendants, Temple is clearly the least culpable. Therefore, the CFTC's request for imposition of a civil monetary penalty as to Defendant Temple shall be denied.

*V. ORDER*

IT IS THEREFORE ORDERED that Plaintiff Commodity Futures Trading Commission's Motion for Summary Judgment is GRANTED in part and judgment is RESERVED IN PART as to the amount of disgorgement owed by Pamela Kingsfield.

IT IS FURTHER ORDERED that Defendants shall be permanently enjoined from engaging in the conduct which shall be entailed in a Permanent Injunction to be entered contemporaneously with this Order.

IT IS FURTHER ORDERED that the Defendants Stein, Finateri, and Kingsfield shall be jointly and severally liable to Plaintiff Commodity Futures Trading Commission to pay

42

restitution in the amount of $7,700,000. IT IS FURTHER ORDERED that the aforementioned restitution amount shall be disbursed by the Court-appointed Receiver on behalf of Defendants, to the extent that such funds are available to him. IT IS FURTHER ORDERED that to the extent the funds available to the Court-appointed Receiver are exhausted, Defendants shall remain jointly and severally liable for any deficiency in satisfaction of the judgment.

IT IS FURTHER ORDERED that Relief Defendants shall be individually liable to Plaintiff Commodity Futures Trading Commission for disgorgement of the following amounts:

| | |
|---|---|
| Relief Defendant Pamela Kingsfield: | $98,168 |
| Relief Defendant Kimberlynn Creek Ranch: | $853,474 |
| Relief Defendant Kingsfield Racing: | $37,192 |
| Defendant Michael Temple and FX & B (jointly and severally): | $211,427. |

IT IS FURTHER ORDERED that the disgorgement liability of Pamela Kingsfield may be increased by the Court contingent upon further findings of the Court regarding the nature of the funds received by Pamela Kingsfield from Kimberlynn Creek Ranch, Inc. and Kingsfield Racing, Inc. IT IS FURTHER ORDERED that **within 90 days of the entry of this Order**, the Commodity Futures Trading Commission shall submit a brief of **no longer than 5 pages** detailing its arguments and attaching evidence, if appropriate, regarding the nature of the funds received by Pamela Kingsfield from Kimberlynn Creek Ranch, Inc. and Kingsfield Racing, Inc. IT IS FURTHER ORDERED that Pamela Kingsfield shall, **within 20 days of the filing of the CFTC's brief**, respond to such brief by the Commodity Futures Trading Commission **with a brief of no more than 5 pages**, attaching evidence if appropriate. **No reply brief shall be**

43

**permitted.** The Court shall then enter a ruling regarding the further liability of Relief Defendant Pamela Kingsfield, if any.

IT IS FURTHER ORDERED that Defendants shall be liable to Plaintiff Commodity Futures Trading Commission for civil monetary penalties in the following amounts, such penalties to be satisfied only to the extent that the Court-appointed Receiver, and then Defendants, have satisfied the restitution obligations ordered herein:

| | |
|---|---|
| Defendant Stein: | $1,041,456 |
| Defendant Kingsfield: | $4,048,296 |
| Defendant Finateri: | $2,264,850. |

IT IS FURTHER ORDERED that the aforementioned civil monetary penalty shall be disbursed by the Court-appointed Receiver on behalf of Defendants, to the extent that such funds are available to him. IT IS FURTHER ORDERED that to the extent the funds available to the Court-appointed Receiver are exhausted, Defendants shall remain personally and individually liable for any deficiency in satisfaction of the civil monetary penalty.

IT IS FURTHER ORDERED that the Court-appointed Receiver shall disburse the assets in receivership in a manner consistent with the language of Section V. of this Order.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this case to the extent necessary to determine the disgorgement liability of Pamela Kingsfield and to the extent necessary to enforce any of the provisions of this Order; however, particularly, the Court shall retain jurisdiction to the extent necessary to enforce the permanent injunction to be entered contemporaneously herewith.

This _4th_ day of _Sept._, 2003.

Richard L. Voorhees
United States District Judge

United States District Court
for the
Western District of North Carolina
September 4, 2003

\* \* MAILING CERTIFICATE OF CLERK \* \*

Re:  3:00-cv-00103

True and correct copies of the attached were mailed by the clerk to the
following:

Joseph Konizeski, Esq.
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC  20581-2058

Timothy J. Mulreany, Esq.
Commodity Futures TRading Commission
Division of Enforcement
Three Lafayette Centre
1155 21st. Street N.W.
Washington, DC  20581

Alan Stein
9809 Emerald Point Drive
#4
Charlotte, NC  28278

Lawrence W. Hewitt, Esq.
James, McElroy & Diehl
600 S. College St.
Charlotte, NC  28202

Joseph Finateri
P.O. Box 8473
La Crescenta, CA  91224

H. M. Whitesides Jr., Esq.
212 S. Tryon St.
Suite 980
Charlotte, NC  28281

H. Monroe Whitesides
212 S. Tryon St.
Suite 980
Charlotte, NC  28281

Leonard G. Kornberg, Esq.
Justice, Eve & Edwards
1801 East Blvd.
Charlotte, NC  28203

R. Lawrence Bonner, Esq.
Homer, Bonner & Delgado, P.A.
100 S.E. Second St.
3400 Bank of America Tower
Miami, FL 33131

William Walt Pettit, Esq.
Kellam & Pettit, P.A.
2901 Coltsgate Rd.
Suite 102
Charlotte, NC 28211

Darlene M. Finateri
3185 Teropa Springs Ln.
Simi Valley, CA 93063


cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other_____       ( )


Date: _9-4-03_

Frank G. Johns, Clerk

By: _____
Deputy Clerk